IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 15, 2005

## STATE OF TENNESSEE v. ALICE IRENE THOMAS

**Direct Appeal from the Circuit Court for Weakley County**
**No. CR66-2004     William B. Acree, Jr., Judge**

_____

**No. W2005-00428-CCA-R3-CD  - Filed December 7, 2005**

_____

A Weakley County Circuit Court jury convicted the appellant, Alice Irene Thomas, of making a false report, a class D felony.  The trial court sentenced her as a Range II, multiple offender to six years. The appellant appeals, claiming that the evidence is insufficient to support the conviction.  Upon review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. AND J.C. MCLIN, JJ., joined.

Langdon S. Unger, Jr., Martin, Tennessee, for the appellant, Alice Irene Thomas.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; Thomas A. Thomas, District Attorney General; and Kevin McAlpin, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

### I.  Factual Background

This case relates to the appellant's son and codefendant Tony Edwards robbing Mary Burks' home.  Tony Edwards pled guilty to multiple offenses, including robbery.  The appellant, who was charged with making a false report, and her son, Courtney Shane, were tried jointly.  At trial, Mary Burks testified that she lived in Martin, Tennessee with her granddaughter, Zella Richardson, John Tipton, and the appellant.  On February 3, 2004, the appellant drove Burks to the bank in order for Burks to cash two social security checks.  Burks cashed the checks and received about two thousand dollars.  Burks stated that she gave two hundred dollars to her granddaughter and put the rest in a small sack and tied the sack to her bra.  About 2:00 a.m. on February 4, Burks was in bed and heard a noise.  A man wearing a white mask came into her bedroom, made her lie on the bed, and asked her where the telephone was.  Burks told the man that she did not have a telephone, and he told her,

"Yes, you do." He then made Burks help him look for the telephone, but they did not find it. The man made Burks go into the living room and forced everyone to lie on the floor. Burks crawled from the living room into her bedroom. A second man brought Burks' granddaughter into the bedroom and made them lie on the bed. He threatened to kill Burks' granddaughter, forced her granddaughter to undress, and demanded money. Burks gave the man the money she had tied to her bra. She said that the two men took the money, her daughter's cellular telephone, and a flashlight and left the home through the back door.

Burks testified that the men were in her home for a long time. Sometime after the robbery, Burks talked to the appellant. According to Burks,

> [the appellant] called me and asked me, said, "I guess - - didn't he get our money?" And I says, "I don't know," just like that. And, you know, I said, "You knew who it was, didn't you?" And she said, "I didn't know he was going to do all of that," is all she said. And I hung up.

On cross-examination, Burks testified that she had known Courtney Shane for a long time and did not recognize his voice during the robbery. She stated that she told the police she did not look at the robbers' faces because she was scared and that she could not identify them.

Zella Richardson, Mary Burks' granddaughter, testified that on February 3, 2004, the appellant took Burks to the bank to cash some checks. Burks gave Richardson eight hundred dollars, and Richardson hid the money. The appellant asked to borrow some money from Richardson, but Richardson would not loan any money to the appellant. That night, the appellant left Burks' home for a while. When she returned, she told Burks, Richardson, and John Tipton that she had seen a shadow behind the house. Richardson looked outside but did not see anything. She then went to her bedroom to watch television while the appellant watched television in the living room. At some point, Richardson checked on the appellant, and the appellant again told her that she had seen a shadow outside. Richardson and the appellant went into Richardson's bedroom and began talking. About midnight, Richardson heard a "boom" and someone ran into the bedroom and knocked the appellant down. After knocking the appellant down, the man put a gun in Richardson's mouth and said, "Where's the money?" He made Richardson take off her clothes, grabbed her by the hair, and dragged her into the living room. She stated that the appellant "was still knocked out." The man took Richardson to her grandmother's bedroom and threw her onto the bed. Two men were present, and one of them put a gun to Richardson's head and threatened to kill her. Burks gave her money to the man, and he took Richardson back to her bedroom and again demanded money. She stated that during the robbery, the appellant "was just laying on the floor, knocked out." She said that she saw one of the men hit the appellant in the back, but "it was fake to me." She said that she also saw the man bend his head down to the appellant, appearing to whisper to her.

On cross-examination, Richardson testified that she knew Courtney Shane but that she could not identify the robbers because they wore hoods. She also did not recognize their voices. She

stated that when she saw one of the men "fake hit" the appellant's back, she suspected that he was Courtney Shane. She stated that she called the police about 2:00 a.m. but did not tell them that she suspected Shane was one of the robbers. She said that Shane was very soft-spoken, that one of the men "growled" when he talked, and that the man appeared to be trying to change his voice. She stated that she did not know if one of the men whispered to the appellant during the robbery.

John Lewis Tipton testified that in the early morning hours of February 4, 2004, he was watching television in Mary Burks' bedroom and Mary Burks was in bed. Tipton heard a boom, and men came into the room, pulled Tipton into the living room, and told him to lie on the floor. The men brought Zella Richardson into the living room, took Tipton and Richardson into the bathroom, and made Tipton and Richardson get into the bathtub. Tipton thought the men were going to kill him, and he fought with them. He could not see their faces because they wore masks.

On cross-examination, Tipton testified that the robbers tried to leave the house through the back door, but they could not get the door open. The men forced Richardson to get out of the tub and open the door for them. Tipton stated that he knew Courtney Shane but did not recognize Shane's voice during the robbery. He stated that Shane had used the back door before but had not used the door since Tipton put new locks on it. He said that the men looked like they were wearing t-shirts over their faces and that he thought he heard three men in the house.

Valerie Cunningham, the custodian of records for the Volunteer Community Hospital, testified that the appellant was treated at the hospital and that her discharge summary stated, "Head contusion and neck strain." Tommie Hamilton, a nurse at the hospital, testified that she was working in the emergency room on February 4. She stated that the appellant had no visible injuries and that a CAT scan revealed no neck injuries. Regarding the appellant's discharge summary, Hamilton stated that the summary had to list a diagnosis and that the appellant's diagnoses were chosen because she had no visible injuries. On cross-examination, she stated that the appellant's contusion or neck strain could have shown up the next day.

Investigator Randall Walker of the Martin Police Department testified that he was called to the police department on February 4 and spoke with Zella Richardson and John Tipton. At that time, Investigator Walker believed the appellant was a victim because the appellant had been taken to the hospital. Later, Investigator Walker went to Mary Burks' home and walked through the house. He also looked around outside and found shoe prints on the south side of the house, a shoe print on the front step, and a muddy shoe print on the front door. Walker then went to Courtney Shane's home to tell him that the appellant had been taken to the hospital. When he arrived, Tony Edwards let him into the home and told him that Shane was in the bedroom. Walker yelled to Shane that Shane's mother was in the hospital. However, Shane did not come out of the bedroom and did not respond to Walker. Walker asked Edwards if he and Shane had been at home all night, and Edwards said yes. Walker saw a pair of muddy tennis shoes by the door and noticed that the tread on the shoes was similar to the shoe prints at Burks' house. Walker took the shoes to Burks' home in order to compare them with the shoe prints. Walker returned to Shane's home and told him that the appellant was in the hospital. Shane replied, "Oh, really?" Walker stated that he found a white t-shirt in

Burks' back yard and that he advised Lieutenant Sammy Liles that the shoes he found at Shane's home were similar to the shoe prints in Burks' yard. He stated that officers took Shane and Edwards to the police department and that he later searched Shane's home. During the search, officers found nine hundred seventy dollars under a mattress and Burks' daughter's cellular telephone.

On cross-examination, Investigator Walker testified that he was not a forensics expert, did not know when the shoe prints were made, and did not know who wore the tennis shoes. He stated that Courtney Shane's girlfriend, Tuwanna Jumper, later told him that the t-shirt he found belonged to Shane. Walker went to the hospital to interview the appellant, and the appellant was "very evasive and mumbled." Walker believed that the appellant knew more than she was revealing. According to Walker's written report, Walker told the appellant during the interview "that the robber was identified by a victim and that officers knew all about what happened."

Tuwanna Jumper, Courtney Shane's wife, testified that she and Shane were not married at the time of the robbery but lived together. On the afternoon of February 3, 2004, Jumper and Shane visited the appellant at Mary Burks' home and then returned to their own home. At some point, Tony Edwards arrived. Jumper went to sleep but woke up once, and Shane and Edwards were gone. She acknowledged that in her written statement to police, she stated that Shane and Edwards left about 1:00 a.m. and returned about 3:00 a.m. On cross-examination, Jumper testified that while she was giving her statement to the police, the police threatened to take her children away from her if she did not cooperate. She said that she gave the police permission to search her home and that she never told the police that the t-shirt found in Mary Burks' yard belonged to Shane.

Tammy Choate testified that in February 2004, she worked at the Exxon station in Martin. In the early morning hours of February 4, Shane and Edwards came into the gas station. Choate gave the police a copy of a receipt, showing that Shane and Edwards bought beer at 1:30 a.m. on February 4.

Lieutenant Sammy Liles of the Martin Police Department testified that he investigated the robbery at Mary Burks' home. Liles and Investigator Walker went to the home, looked at shoe prints, and compared them with the tennis shoes found in Shane's home. Lieutenant Liles had Investigator Walker bring Shane and Edwards to the police department, and Liles interviewed them and Tuwanna Jumper. Liles also interviewed the appellant. During the appellant's interview, the appellant told Liles that she had been attacked from behind and knocked unconscious. She also told him that she did not know who was involved in the robbery. On cross-examination, Lieutenant Liles testified that the receipt Tammy Choate gave the police did not show what time Shane and Edwards purchased beer. He said that during his interview with Jumper, Jumper lied to protect Shane and that he did not threaten to take Jumper's children away from her.

Tony Edwards testified that he and Shane were indicted for robbing Mary Burks' home and that he pled guilty. He stated that Shane participated with him in the robbery. On cross-examination, Edwards testified that he told Shane's attorney that Shane was not involved in the robbery. However, he said that he lied to the attorney. The jury convicted Courtney Shane of

aggravated robbery, aggravated assault, and aggravated burglary and convicted the appellant of filing a false report, a Class D felony.

## II. Analysis

The appellant claims that the evidence is insufficient to support her conviction. She contends that there is no proof that she made a report or statement about any material fact knowing it to be false. In addition, she notes that according to Investigator Walker's testimony, he advised her during the interview that the robber had been identified and that the police "knew all about what happened." She contends that given this statement, it "would then be factually and legally impossible to intentionally obstruct or hinder an officer" from apprehending the robber. The State claims that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see Tenn. R. App. P. 13(e). On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the jury as trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Moreover, we note that a guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). As charged in the indictment, a person makes a false report when the person "[makes] a report or statement in response to a legitimate inquiry by a law enforcement officer concerning a material fact about an offense or incident with the intent to obstruct or hinder the officer from . . . [a]pprehending or locating another person suspected of committing an offense." Tenn. Code Ann. § 39-16-502.

In this case, the indictment alleges that the appellant gave a false report to Lieutenant Sammy Liles. Liles testified at trial that he questioned the appellant about the robbery and that the appellant told Liles she did not know who robbed Mary Burks' home. However, Burks testified that she talked with the appellant after the robbery and that the appellant indicated knowing who committed the crimes. Moreover, Zella Richardson testified that she saw one of the robbers appear to whisper to the appellant during the robbery and that he "fake hit" the appellant's back. The appellant had taken Mary Burks to the bank earlier that day, knew that Burks had cash, and asked to borrow money from Richardson. In a joint trial, the jury convicted the appellant's son of committing the robbery, and taken in the light most favorable to the State, a reasonable juror could have concluded that the appellant informed her son that Burks had money and knew he was going to rob Burks. Thus, the

jury also could have concluded that the appellant knowingly lied to Lieutenant Liles when she told him that she did not know who committed the crimes. Obviously, the robber's identity was a material fact in the case. We conclude that the evidence is sufficient to support the conviction.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE